IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

v.                                                   No. 2:25-cr-02610-SMD

**JOSE GABRIEL GURROLA-NORIEGA,**

    **Defendant.**

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

THIS MATTER is before the Court on Defendant Jose Gabriel Gurrola-Noriega's Motion to Suppress. Doc. 22. A hearing was held on September 30, 2025. Having fully considered the parties' submissions, evidence, and arguments, the Court hereby DENIES Defendant's Motion.

### FINDINGS OF FACT

1. At the suppression hearing, the government presented the testimony of three Border Patrol Agents (BPA)—Jorge Zapeda, Victor Cabrera, and Orlando Perez—who were involved in the law enforcement response and investigation that led to the arrest of Defendant in this case. The Court found them to be experienced agents and finds credible the testimony relied upon for this decision.[1]

2. Defendant was arrested on the morning of April 11, 2025, in the parking lot of the Stanco Metal Fabrication warehouse (the Stanco building), near Santa Teresa, New Mexico. The Stanco building is approximately 0.2 to a quarter of a mile due north from the United

---

[1] The Court does not rely on facts outside of the findings in this decision.

States/Mexico international border. This area is known as a common area for human smuggling. Recently entered illegal aliens and drivers for human smuggling organizations are often encountered in the Stanco parking lot. Alien smuggling traffic occurs in the area directly south of the Stanco building and in the Stanco parking lot almost daily.

3. Stanco employees often go to their vehicles in this same parking lot during their workday for legitimate reasons such as breaks, to eat lunch, make phone calls, etc., and quite a few park in reverse, as depicted in Exhibits 2 and 8. *See* Doc. 28, Exs. 2, 8. Furthermore, vendors have regular business delivering or picking up items from the business and use the parking lot to load and unload. Other visitors with legitimate business frequent the parking lot as well.

4. Border Patrol Agents assigned to the area regularly patrol the desert around the Stanco building as well as the Stanco parking lot and have frequent contact with the employees, venders, and visitors they encounter in the parking lot. Agents experience these interactions as friendly, quick, and relaxed, receiving straightforward answers to the agents' questions as to those individuals' presence in the area.

5. On the morning of April 11, 2025, at approximately 10:30 a.m., BPA Zapeda, patrolling in the desert near the Stanco building, heard a call over his radio indicating that another agent saw someone cross the international border and that the person in question was heading north towards the Stanco building. In response, BPA Zapeda drove to the south end of the Stanco building where he could see someone hiding in the bushes at the southeast corner. BPA Zapeda shared this information with other agents over his radio before he exited his vehicle. BPA Zapeda approached the person, learned that the man was a citizen of another country and had just entered the United States illegally, and arrested him.

6. BPA Cabrera was also in the area, heard the call, and responded to the south end of the Stanco building. Upon arrival, BPA Cabrera saw BPA Zapeda approaching the man hiding in the bushes. By the time BPA Cabrera made his way to them, BPA Zapeda had arrested the subject. BPA Cabrera did not question or otherwise engage with the illegal alien.

7. BPA Cabrera turned and went a short distance, estimated by BPA Zapeda to be 25 to 30 feet, into the Stanco building parking lot. Based on BPA Zapeda's training and experience, he knew that drivers for human smuggling groups are frequently waiting for people who have just illegally entered the United States in that parking lot. And, if the drivers have not yet arrived, people waiting to be picked up are often hiding in the bushes along the building. Based on the position of the bushes, the person who had just been arrested hiding in the bushes could not see the cars, and anyone arriving or waiting to pick him up could not have seen the man hiding in the bushes.

8. As BPA Cabrera proceeded to walk through the parking lot that day, he observed vehicles parked there and the bushes along the building. BPA Cabrera noticed Defendant in the driver's seat of a vehicle that was parked in reverse with the engine running, near the building and some bushes where aliens often hide while they wait to be picked up by smugglers. BPA Cabrera estimated that Defendant's vehicle was approximately 50 yards from where BPA Zapeda arrested the illegal alien in the bushes. As BPA Cabrera got closer to Defendant's vehicle, he saw Defendant shrug down into his seat, which caught the agent's attention.

9. BPA Cabrera approached Defendant, identified himself, and asked if Defendant worked there. Defendant quickly blurted out that his brother worked there. BPA Cabrera noted that Defendant kept looking around and appeared very nervous in contrast to BPA Cabrera's

experience interacting with employees, vendors, and other visitors in the past. As the encounter continued, Defendant made further statements that contradicted his first—indicating next that his friend worked there instead, then that Defendant wasn't sure if his friend worked at the Stanco building or somewhere else. Defendant continued looking around and his nervousness and his story that was "all over the place" stood out to BPA Cabrera.

10. BPA Cabrera noticed that Defendant's vehicle, an older model Hyundai Santa Fe, had very darkly tinted back windows. *See* Doc. 28, Ex. 3A.

11. BPA Cabrera also observed a paper license tag on the back of the vehicle that appeared to have been attached, removed, and reattached several times with multiple layers of tape that appeared dirty and messy. This is uncommon to see on a recently purchased vehicle with temporary paper tags issued by a car dealer—those are typically clean. It is, however, a concealment method that agents have seen smuggling organizations use with their transportation vehicles, sometimes switching out the paper tags with other license plates to attempt to thwart identification by law enforcement.

12. BPA Cabrera asked Defendant for his identification and requested a records check. He learned that Defendant was wanted in Texas.[2]

13. BPA Perez was also working in the area that morning and heard the initial call that an agent saw someone illegally cross the international border directly south of the Stanco building. In response, BPA Perez also went to the south end of the Stanco building where BPA

---

[2] Though BPA Cabrera did not testify further about this, the Pretrial Services Report, Doc. 5, filed on April 14, 2025, indicates that there was an active warrant for Defendant's arrest at that time, but it was only extraditable within Texas.

Zapeda had just arrested the man he found hiding in the bushes. BPA Perez questioned the man who indicated he was to be picked up nearby but did not provide additional details.

14. BPA Perez then proceeded to the Stanco parking lot. He received information about BPA Cabrera's interaction with Defendant and introduced himself to Defendant who was still sitting in his vehicle. Like BPA Cabrera, BPA Perez asked Defendant about his business at the lot, and Defendant gave the same or similar information that he was there to pick up his brother or a friend. Consistent with BPA Cabrera's observations, BPA Perez also observed that Defendant was in an older SUV, with the engine still running, and paper tags that appeared to have been removed and reattached with dirty tape, and that the rear parts of the vehicle had darker tint than the front windows.

15. The week prior to Defendant's arrest, BPA Perez interviewed a person who was caught by agents just after entering the United States illegally at a different location nearby. In that case, the person had a phone and showed BPA Perez a picture of the vehicle they understood would pick them up and transport them to their next location within the United States. BPA Perez noticed that Defendant's vehicle appeared to be the same type of vehicle. Both vehicles were the same tint (darker in the rear), same model SUV, same headlight and rims. *See* Doc. 28, Exs. 3A, 3B, 5. BPA Perez believed it was in fact the same vehicle that was in the picture the week prior.

<u>CONCLUSIONS OF LAW</u>

1. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.

2. Where the Fourth Amendment applies, a warrant is generally required before an officer may search or seize a person or his property. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). "A warrantless arrest violates the Fourth Amendment unless it was supported by probable cause." *United States v. Sanchez*, 13 F.4th 1063, 1072–73 (10th Cir. 2021) (citing *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2008)).

3. Defendant seeks to suppress all statements and evidence obtained as a result of his arrest as "fruits of the poisonous tree." *See* Doc. 22 at 5 (citing *United States v. Esquivel-Rios*, 786 F.3d 1299 (10th Cir. 2015)). He argues that BPA Perez lacked probable cause because there were no aliens in Defendant's vehicle and no witness statements or confession connecting Defendant to smuggling activity. *Id.* at 6. BPA Perez was unable to identify to vehicle with certainty and there was no indication that the vehicle or Defendant himself had ever been involved in smuggling activity.[3] *Id.* at 8. Instead, BPA Perez relied on Defendant's proximity to an individual apprehended for illegal entry, the characteristics of the Stanco parking lot, and the fact that Defendant's vehicle was parked in reverse. *Id.* at 6–7. Defendant notes that there were a large number of vehicles in the immediate area, including vehicles parked in reverse, and argues neither fact is suspicious or indicative of smuggling. *Id.* at 7–8. Finally, Defendant argues that nervousness around Border Patrol

---

[3] At the hearing, defense counsel questioned the agents with some emphasis regarding probable cause for the charge of conspiracy to transport aliens, as filed in the charging documents, rather than actual transporting. Defendant did not focus on this argument in his brief or in his argument at the close of the hearing. Nonetheless, it bears mentioning that the Court heard the argument in his questions and did not disregard it. However, "the probable cause inquiry is not restricted to a particular offense, but rather requires merely that officers had reason to believe that a crime—any crime—occurred." *United States v. Turner*, 553 F.3d 1337, 1345 (10th Cir. 2009); *see also Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). Here, the two charges Defendant attempts to distinguish are, in fact, different ways of violating the same statute, 8 U.S.C. § 1324, either by doing the transporting, conspiring to transport, or, though not mentioned, attempting or aiding and abetting transportation.

or immigration agents did not indicate illegal activity, especially as agents were aware that Defendant is a non-citizen. *Id.* at 9–10.

4. In its response, the government identified the following factors supporting probable cause to believe Defendant was involved in alien smuggling at the time he was arrested: (1) Defendant was parked at the Stanco building, which is very near the southern United States border and a common area for smuggling activity (Doc. 28 at 9–10); (2) a man who admitted to illegal entry was arrested in the bushes at the end of the Stanco building a short distance from the parking lot, and expected to be picked up nearby (*id.* at 8–9); (3) the vehicle was "tactically parked" facing away from the building and with the engine running (*id.* at 11); (4) Defendant's vehicle had temporary plates, which is common in smuggling organizations (*id.*); (5) an agent[4] recalled seeing a similar vehicle involved in another smuggling activity (*id.* at 10); (6) Defendant appeared nervous, avoiding eye contact and slumping down in his seat as the agent approached (*id.* at 11); and (7) Defendant initially stated he was picking up his "brother" but then said he was picking up "a friend" (*id.* at 9).

5. Through testimony during the suppression hearing, the government pointed to additional factors to support probable cause for Defendant's arrest: (1) Defendant's vehicle was an older model SUV, of the type commonly used by alien smuggling organizations which Agent Perez testified was less expensive to obtain, just in cased it's seized by law enforcement, and could fit more passengers; (2) Defendant's vehicle had darker tint in the back windows than in the front, which can be used by smugglers to hide the contents of the vehicle; (3) the temporary paper plates were attached with layers of tape and appeared dirty

---

[4] In its response, the government proffered that it was BPA Cabrera who remembered the vehicle from a previous event but clarified through testimony at the hearing that it was BPA Perez instead.

and to have been attached removed and reattached; and (4) BPA Perez testified that he believed Defendant's vehicle, as seen in Exhibits 3A and 3B, was the same vehicle a recently entered illegal alien showed him as the pick-up vehicle during an arrest the week prior, as seen in Exhibit 5.

6. An arrest is "characterized by highly intrusive or lengthy search or detention," and must therefore be supported by probable cause. *United States v. Cooper*, 733 F.2d 1360, 1363 (10th Cir. 1984). Reasonable suspicion[5] does "not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). In contrast, probable cause to conduct a search or arrest exists when the facts available would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present. *Florida v. Harris*, 568 U.S. 237, 243 (2013); *United States v. Edwards*, 632 F.3d 633, 639 (10th Cir. 2001). Probable cause is measured against an objective standard. *United States v. Santana-Garcia*, 264 F.3d 1188, 1192 (10th Cir. 2001). The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive. *United States v. Treto-Haro*, 287 F.3d 1000, 1006 (10th Cir. 2002). Although probable cause does not require facts sufficient for a finding of guilt, it does require more than mere suspicion. *United States v. Morris*, 247 F.3d 1080, 1088 (10th Cir. 2001) (internal citations omitted).

---

[5] In its response, the government appears to argue for the Court to apply the reasonable suspicion standard: "Border Patrol 'officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.'" Doc. 28 at 6–7. This misapprehends the standard in this challenge to Defendant's arrest, however. In this case, Defendant's vehicle was already stopped when BPA Cabrera approached Defendant in the Stanco parking lot, and Defendant was arrested shortly after his initial interactions with BPAs Cabrera and Perez. Therefore, the Court does not review the facts under the reasonable suspicion standard; rather, the correct standard and pertinent question is whether there was probable cause to arrest Defendant.

    Probable cause doesn't require proof that something is more likely true than false. It requires only a "fair probability," a standard understood to mean something more than a "bare suspicion" but less than a preponderance of the evidence at hand. *United States v. Denson*, 775 F.3d 1214, 1217 (10th Cir. 2014) (citing *United States v. Ludwig*, 641 F.3d 1243, 1252 & n.5 (10th Cir. 2011).

7. A court may not find "probable cause simply by piling hunch upon hunch." *United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004.) Instead, considering "the totality of the circumstances, a reviewing court 'must examine the facts individually in their context to determine whether rational inferences can be drawn from them' that support a probable cause determination." *Id*. (citing *United States v. Martinez-Cigarroa*, 44 F.3d 908, 911 (10th Cir. 1995)). However, "[a] factor does not become irrelevant simply because it is 'readily susceptible to an innocent explanation.'" *Id*. (citing *Arvizu*, 534 U.S. at 274).

8. The parties and the Court agree that there was reasonable suspicion, at a minimum, to believe Defendant was involved in alien smuggling. Defendant argues that the facts are insufficient to support a find of probable cause, however. The Court disagrees. Considering the totality of the circumstances presented, the agents had probable cause to believe Defendant was involved in alien smuggling at the time of his arrest. Defendant is correct that almost all of these facts, examined individually, are not suspicious per se. However, when considering all the facts described above, particularly in light of the fact that Defendant was in a vehicle that appeared to match the photograph of a pick-up vehicle the week before in a different failed smuggling event, Defendant's arrest did not violate the Fourth Amendment. The Court notes that the evidence presented was not definitive that Defendant's car and the car in Exhibit 5 were in fact the same car. Nevertheless, in

comparing the two cars, the difference in little to no tinting in the front windows and extremely dark tinting in the rear windows is striking in resemblance and supports probable cause even if the two cars are only very similar. Taken in totality, these facts support a finding that there was probable cause to believe that Defendant was engaged in a crime at the time of his arrest

## **ORDER**

THIS MATTER comes before the Court on Defendant's Motion to Suppress Evidence and Statements (Doc. 22) obtained as a result of his arrest on April 11, 2025. The Court concludes that the agents had probable cause for the arrest and did not violate the Fourth Amendment.

WHEREFORE, IT IS HEREBY ORDERED that Defendant's Motion to Suppress is DENIED.

_____
**SARAH M. DAVENPORT**
**UNITED STATES DISTRICT JUDGE**